UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ANA JUSTINA PEÑA,                                      :
                                                                          07 Civ. 11099 (GWG)
                              Plaintiff,               :

              -v.-
                                                       :      OPINION AND ORDER
MICHAEL J. ASTRUE,
Commissioner of Social Security,                       :

                              Defendant.               :
------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

        Plaintiff Ana Justina Peña brings this action pursuant to 42 U.S.C. § 405(g) for review of

the final decision of the Commissioner of Social Security (the "Commissioner") denying her

claim for Supplemental Security Income ("SSI") benefits.  The parties have consented to

disposition of this matter by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

See Consent to Proceed Before a United States Magistrate Judge, filed July 23, 2008 (Docket

# 13).  The Commissioner has moved for judgment on the pleadings and dismissal pursuant to

Fed. R. Civ. P. 12(c).  For the reasons stated below, the Commissioner's motion is denied in part

and granted in part.

I.       BACKGROUND

        A.       Procedural History

        Peña filed for disability benefits on January 12, 2006.  See Administrative Record

(annexed to Answer, filed June 19, 2008 (Docket # 9)), at 49-52.[1]  Her application was denied on

_____

        [1]  "R." refers to the page numbers of the administrative record.

1

April 28, 2006.  R. 38-41.  She requested a hearing before an Administrative Law Judge ("ALJ"), R. 42, and a hearing was held on June 13, 2007, R. 172-92.  The ALJ found Peña was not disabled within the meaning of the Social Security laws.  R. 14-20.  On August 29, 2007, Peña appealed to the Appeals Council.  R. 6.  On September 21, 2007, the Appeals Council denied her request for review.  R. 3-5.  Peña then filed the instant action.  See Complaint, filed Dec. 7, 2007 (Docket # 2).

The Commissioner has now moved for judgment on the pleadings.  See Notice of Motion, filed July 8, 2008 (Docket # 10); Memorandum of Law in Support of the Commissioner's Motion for Judgment on the Pleadings, filed July 8, 2008 (Docket # 11).  Peña, who is represented by counsel, has filed opposition papers.  See Memorandum of Law in Opposition to Commissioner's Motion for Judgment on the Pleadings, filed Aug. 5, 2008 (Docket # 14) ("Pl. Mem.").  The Commissioner has filed a reply memorandum.  See Reply Memorandum of Law in Further Support of the Commissioner's Motion for Judgment on the Pleadings, filed Aug. 20, 2008 (Docket # 15).

B.    Peña's Written Statements and Testimony

Peña is a lawful permanent resident who came to the United States in 1977.  R. 176.  She is 5'3" and weighs about 150 pounds.  R. 176.  She completed high school and two years of college at City University of New York.  R. 177.  She can speak and understand basic English, and took tests during college in English.  R. 185.  At the time of the hearing she had a husband and two children.  R. 176.  She was 43 and her two children were 10 and 15.  R. 175.

Although she initially reported she had not worked for the 15 years prior to her disability, R. 67, at her hearing she testified that she worked "off the books" from 1997 to 2000 in a

clothing store, R. 178-79.  Her duties included putting on price tags, waiting on customers, working the cash register and watching the store.  R. 178-79.  As part of her duties she lifted items that weighed 10-15 pounds.  R. 179.  She left the job when the store closed.  R. 178.

She testified she has a medical problem in her spine that causes pain in her lower back, buttocks, hips and legs down to her shins.  R. 181-82.  The pain began around 2003.  R. 183.

She is taking Lidoderm, Mobic, Skelaxan and Prevacid for the pain.  R. 183.  She had physical therapy the Monday prior to the hearing.  R. 183.  Her prior medications made her nauseous, but the medications she was taking at the time of the hearing did not.  R. 187-88.  She wakes up one or two times during the night because of back pain.  R. 188.  She had adverse effects after receiving injections.  R. 183-84.  She also does a home exercise program.  R. 186.

Over time the pain has gotten worse.  R. 184.  She can walk less than 5 blocks.  R. 184.  After standing for 2 hours, she will feel pain when she sits back down.  R. 184.  She cannot sit for more than 2 hours at a time.  R. 184.  She can lift more than 5 pounds or a gallon of milk, but she would feel pain if she lifted a bag of groceries.  R. 184-85.  She cooks for her family, but when she finishes she has to take a pill for the pain.  R. 185.  She does not do housecleaning or laundry.  R. 185.  Her initial application states she goes shopping for food, R. 78, but also notes on the following page that she did not do any shopping, R. 79.  During her testimony she said she sometimes shops with her family, but she does not carry any shopping items.  R. 185-86.

She stays home most of the time and rarely goes anywhere with her children.  R. 186-87.  According to her testimony, she never or very rarely goes to church.  R. 187.  Her initial SSI application, however, stated she went to church weekly.  R. 80.

_____B.   <u>Health Records</u>

_____   1.   <u>Lisa Gandolfo MRI</u>

_____On November 17, 2004, Peña had an magnetic resonance imaging ("MRI") scan taken by Dr. Lisa Gandolfo.  R. 89-90.  The scan showed "[m]ultilevel disc desiccation in and degenerative disc disease as described, most severe at L4/5 and L5/S1, with grade I posterior spondylolisthesis[2] of L5 on S1."  R. 89-90.

2.   <u>Dr. Naghma Burney's Records</u>

Dr. Naghma Burney is one of Peña's treating physicians.  Her November 7, 2005 notations indicate an upper respiratory infection and suggest Peña had an appointment for rehabilitation.  R. 117.  The January 10, 2006 notations include complaints of backache and headache.  R. 117.  On January 18, 2006, a report on bloodwork done for Dr. Burney showed low HDL, but was otherwise unremarkable.  R. 124-25.  Notations dated only "2006" indicate tiredness, backache and degenerative disc disease.  R. 118.  Notations dated February 2, 2006 indicate backache.  R. 119.  Tylenol # 3 was prescribed and Peña was referred for physical therapy and rehabilitation.  R. 119.  Notations dated February 21, 2006 indicate degenerative disc disease and refer Peña for physical therapy.  R. 118.  Notations dated November 2, 2006 indicate flu and backache, and prescribe Mobic.  R. 119.

_____On January 26, 2006, Dr. Burney submitted a Medical Source Statement of Ability to Do Work Related Activities (Physical) in support of Peña's application.  R. 101-07.  Dr. Burney diagnosed her with degenerative disc disease.  R. 101.  Dr. Burney opined that this resulted in a

_____

[2]  Spondylolisthesis is "the anterior displacement (slip) of one vertebra on the one below."  Anthony Woodward, M.D, 4-11 <u>Att'y's Textbook of Med.</u> 11.33 (3d Ed. 2002)

4

backache that radiated in both legs, and was worsened by walking or lifting.  R. 101.  She found

Peña could not bend below 30 degrees.  R. 102.  She opined that Peña could lift less than 10

pounds, could stand less than 2 hours in an 8-hour workday, had a restricted ability to push or

pull using lower extremities, and would need to alternate between standing and sitting to relieve

pain.  R. 103-04.  Further, Dr. Burney opined that Peña could only occasionally climb, balance,

kneel, crouch, crawl or stoop.  R. 104.  However, Dr. Burney found no limitation on reaching,

handling, fingering, feeling, speaking, hearing or seeing.  R. 105.  The only environmental

restriction was an inability to be around moving machinery.  R. 106.

Notations dated January 11, 2007 indicate backache, and note that Peña was undergoing

physical therapy.  R. 120.  She was prescribed Mobic and Skelaxan.  R. 120.

In a February 6, 2007 letter, Dr. Burney noted that "as per patient" Peña could not "sit or

walk for long, has to change position frequently."  R. 169.  June 11, 2007 notes indicated that

Peña was on Claritin-D 24 Hour, Ioratadine, Nasonex, Skelaxin and Tylenol with Codeine.

R. 170.  This note indicated that Peña reported a walking ability/tolerance of less than 5 blocks

and difficulty with house and yard work.  R. 170.  Dr. Burney's examination showed normal

muscle strength, gait and coordination.  R. 170-71.  The note concluded with an impression of

"[d]isplacement of lumbar intervertebral disc w/o myelopathy."  R. 171.

      3.    New York-Presbyterian Health Records

Peña was treated at New York-Presbyterian Hospital's Columbia-Presbyterian Medical

Center from August 22, 2005 through May 14, 2007.  R. 92-99, 129-63.

An August 22, 2005 entry in her medical records showed tenderness of her joints, and

pain with forward flexion and extension.  R. 92.  Voltaren was discontinued because it was

making her sleepy.  R. 92.  She had muscle strength of five of five, and her deep tendon reflexes were "2+."  R. 92[3].  The notes indicated "sacroiliitis vs. non-specific back pain."  R. 92.  The assessment/plan section re-prescribed Mobic and the Lidoderm Patch, and suggested that she continue her home exercise program.  R. 92.

A September 22, 2005 entry showed similar complaints, and reported a "stable amount of pain" with no radiation.  R. 93.  The entry indicated the pain was "well relieved" by her medication, that the pain was worst with long periods of standing, and that Peña was "minimally compliant" with her home exercise program.  R. 93.  On examination, Peña experienced pain with forward flexion and extension, but had a full range of motion.  R. 93.  She showed normal strength, reflexes and sensation.  R. 93.  The assessment/plan section reinforced the importance of her home exercise program and added external oblique strengthening to the program.  R. 93.

In November 8, 2005, Dr. T. Fatmi and Dr. L. Weimer reported on electromyography ("EMG") and nerve conduction studies that showed normal strength and sensation, normal motor and sensory nerve conduction and no abnormal spontaneous activity in her left leg.  R. 94-95, 121-23.  The doctors concluded that this was a normal study and there was no "electrophysiologic evidence diagnostic for lumbosacral radiculopathy, plexopathy, myopathy, or polyneuropathy."  R. 94.

A November 14, 2005 entry showed refills of her prescriptions.  R. 96.  A November 28, 2005 entry noted that Peña reported her 20 sessions of physical therapy seemed to have helped.  R. 97.  She reported no radiating pain, and an examination showed normal strength and

---

[3] Both of these ratings are apparently normal.  See Lorne Label, MD & Laura Obiso, 11-85 Att'y's Textbook of Med. 85.42-43 (3d Ed. 2002).

reflexes.  R. 97.  It suggested Peña suffered from chronic low back pain.  R. 97.  It recommended

weight loss in addition to the current regime of medication and exercise.  R. 97.

A January 23, 2006 entry showed she was ready to start physical therapy for lumbar

stabilization again, and that she would continue taking Mobic and Lidoderm.  R. 98, 129.  On

physical examination, it indicated normal strength and reflexes, no muscle atrophy, full forward

flexion and no dural tension.  R. 98, 129.  Further, it noted she had a bad reaction to Lidocaine.

R. 98, 129.

In February 2006, Peña re-enrolled in physical therapy.  R. 130-142.  An initial

evaluation sheet dated February 22, 2006 showed complaints of back pain upon ambulation or

prolonged standing.  R. 130-31.  It listed as a short term goal, raising "sitting tolerance" to about

45 minutes without pain and a long term goal of raising tolerance to more than an hour and a

half.  R. 131.  It also suggested education in changing sleeping positions for greater

comfort.  R. 131.  Progress reports from March 1 to April 5, 2006 showed subjective pain

fluctuating between 0 of 10 to 7 of 10, with a general lessening trend.  R. 132-35.  A flow chart

showed her exercises and physical therapy from March 1 to April 5, 2006.  R. 136-41.  A March

13 entry showed pain on flexion and extension, but normal strength, reflexes and sensation.

R. 99, 133.  It recommended the continuation of physical therapy and medications.  R. 99, 133.

An April 5, 2006 discharge summary stated that the goals set February 22, 2006 were met and

that Peña reported 0 of 10 pain.  R. 142.

An April 10, 2006 entry noted that Peña reported back pain from lifting heavy objects

and recommended ongoing prescriptions and that she continue her home exercise

program.  R. 143.  A July 10, 2006 entry noted that Peña reported that she had not kept up with

the exercise program over the past 3 months and her pain had gotten worse again.  R. 144.  Peña

reported heartburn symptoms from the Mobic, which had been relieved by Prevacid in the

past.  R. 144.  Prevacid was added to her medications.  R. 144.  Left side straight leg raising was

positive.  R. 144.  Notations indicated no lumbosacral paraspinal muscle spasms.  R. 144.

_____An August 7, 2006 entry notes that Peña reported back pain in the rotation and extension

of lumbosacral spine.  R. 145.  Peña reported that her pain was usually worse in the morning

when she woke.  R. 145.  On examination, the entry indicated a mild spasm of the midthoracic

and lumbosacral paraspinal muscles.  R. 145.  Straight leg raising was positive at thirty degrees.

R. 145.  In addition to her current medications, it suggested a return to physical therapy.  R. 145.

Additionally, if the pain continued, it recommended possible future use of injection.  R. 145.

An October 23, 2006 entry noted the discontinuation of Mobic, and began treatment with

Tramadol.  R. 146.  It noted Peña's complaints of back and neck pains.  R. 146.  Additionally,

the entry noted she had begun to take Lexapro medication.  R. 146.

On November 6, 2006, Peña started physical therapy again.  R. 147-52.  At that time she

was taking Lexapro, Tramadol and Meloxicam.  R. 147.  Peña's goals this time were, among

others, to "sit, stand and walk" without pain.  R. 147.  Specifically, she wished to obtain short

term increases of sitting 45 minutes without pain, and long term increases of an hour and a half

without pain.  R. 148.  The treatment plan included therapeutic exercise, manual therapy,

neuromuscular reeducation and modalities PRN.  R. 148.  Between November 8, 2006 and her

discharge from physical therapy February 1, 2007, Peña reported a steady decrease in subjective

pain.  R. 149-57.  A November 20, 2007 entry indicates that Peña confirmed that the physical

therapy helped the pain.  R. 150.  The entry noted her medication regime was again Mobic and

the Lidoderm patch for pain.  R. 150.  In addition to medication, she was to continue the home exercise plan and physical therapy.  R. 150.  At that time, Tramadol and Lexapro treatments were ended.  R. 150.  The February 1, 2007 discharge summary sheet showed the physical therapy's goals were met, Peña stated that she felt "okay," and that her ambulation, strength and range of motion were within functional limits.  R. 157.

_____A February 12, 2007 entry noted Peña would be going for an EMG, an x-ray to measure "A-P translation" and instability, and a MRI scan of lumbar spine.  R. 158.  The resulting February 16, 2007 x-ray report showed no evidence of spondylolisthesis or spondylolysis[4] and "a narrowing of the L4/L5 and L5/S1 interspaces."  R. 159.  The narrowing was worst at L5/S1.  R. 159.  The resulting March 2, 2007 MRI report of the lumbar spine showed "varying degrees of desiccation of L4-L5 and L5-S1 discs indicating degeneration of those intervertebral discs."  R. 160.  The description noted a "small central disc protrusion the anterior thecal sac" at L4-L5.  R. 160.  Additionally, it showed an annular tear at L5-S1 that had not existed in a prior study.  R. 160.  However, a previously noted disc protrusion at L5-S1 was no longer noted.  R. 160.  The resulting March 14, 2007 EMG report showed "no electrophysiologic evidence for lumbosacral radiculopathy, neuropathy, or myopathy."  R. 162.  The report concluded this was a "normal study" and that there had been no change since November 2005.  R. 162.

_____A May 14, 2007 entry written by Dr. Ana Bracilovic summarized the findings of the above tests.  R. 164.  On examination, Dr. Bracilovic noted Peña walked with a mildly antalgic gait, and was able to toe walk, heel walk and tandem walk.  R. 164.  Peña felt pain during trunk

---

[4]  Spondylolysis is "a defect in that part of the vertebral arch . . . between the superior articular process and the remainder of the arch."  Anthony Woodward, M.D, 4-11 Att'y's Textbook of Med. 11.33 (3d Ed. 2002)

9

extension and lateral rotation.  R. 164.  Notes indicate normal strength, sensation and reflexes.

R. 164.  Prescriptions were written for Mobic, Prevacid, and Lidoderm patches.  R. 164.

Additionally, Peña was prescribed additional physical therapy.  R. 164.

          4.        Dr. Armand Cacciarelli's Consultive Examination

Peña had a consultive examination with Dr. Armand Cacciarelli on March 30, 2006.

R. 111.  According to Dr. Cacciarelli, a MRI scan showed Peña had a herniated disk L4-L5, L5-

S1, with a Grade 1 posterior spinal lesthesis, as well as degenerative changes in the LS spine.

R. 112.  Dr. Cacciarelli found Peña's condition limited her ability to "push, pull, carry heavy

loads and stand or walk for a long period of time."  R. 112.

        C.        Expert Testimony at the ALJ Hearing

          1.        Dr. Warren Cohen's Medical Expert Testimony

At the hearing, Dr. Cohen testified based on a review of Peña's records that Peña had

degenerative disease of the spine in the lumbar region.  R. 188.  He opined that Peña could lift 20

pounds occasionally, 10 pounds frequently, and stand and/or walk for 6 hours of a workday.

R. 189.  He disagreed with Dr. Burney's contrary assessment because Dr. Cohen felt that

assessment was not supported by the medical reports.  R. 189.

          2.        Fass Karlin's Vocational Expert Testimony

In providing an opinion as vocational expert ("VE"), Karlin was asked to assume a

person of the claimant's age, education and prior work experience.  R. 190.  By education, the

ALJ clarified that he meant someone with a "basic command of English, as well as primary

Spanish, who can do work if it is simple, routine, and requires low levels of concentration."

R. 190.  The ALJ requested jobs at the light level, at the sedentary level, and at the sedentary

10

level with a sit/stand option.  R. 190.

The VE said such a hypothetical person could do work as an assembler of small parts, which is light unskilled work, Specific Vocational Preparation 2.  R. 190.  She noted there were 1,588 of these jobs in the local economy and 1,200,000 in the national economy.  R. 190. Additionally, the hypothetical person could work: as a cashier (54,794 local/ 3,500,000 national jobs), which is also light unskilled work; as a surveillance system monitor (968 local/55,000 national jobs), which is sedentary, unskilled work that can be done with a stand/sit option; as an order clerk (1209 local/ 293,000 national jobs) which is sedentary, unskilled work that can be done with a stand/sit option; and as an assembler of jewelry (683 local/42,000 national jobs) which is sedentary unskilled work that can be done with a stand/sit option.  R. 190-91.

D.      ALJ Decision

On July 6, 2007, ALJ Kenneth Levin issued a decision denying Peña SSI benefits.  R. 14-20.  The ALJ concluded that Peña was not "disabled" within the meaning of the Social Security Act.  R. 16.  He found Peña's "allegations regarding her limitations" to be "not totally credible for the reasons set forth in the body of the decision."  R. 19.

In reviewing the medical evidence, the ALJ found that Peña's medically-determinable impairment was "discogenic and degenerative joint disease of her lumbosacral spine."  R. 18. He accepted Dr. Cohen's conclusion that Peña could perform light work, including sitting for at least 6 of 8 hours in a work-day, standing and/or walking, and lifting/carrying 20 pounds occasionally and 10 pounds frequently.  R. 18.  Additionally, the ALJ agreed with Dr. Cohen that Dr. Burney "grossly overstated" Peña's limitations.  R. 18.  Further, the ALJ read Dr. Burney's report as allowing for sedentary work with a "stand/sit" option.  R. 17.

The ALJ also found that, because of her pain, Peña would be likely restricted to simple, routine work that required only low levels of concentration, and could not return to her past relevant work.  R. 18.  However, based on the testimony of the vocational expert, the ALJ found there were a significant number of jobs in the national and local economy that Peña could perform under Dr. Cohen's view of Peña's limitations.  R. 18. The ALJ further concluded that a substantial number would exist even if Dr. Burney's interpretation of Peña's limitations were adopted.  R. 18.

Specifically, the ALJ's findings were as follows:

1.  The claimant has not engaged in substantial gainful activity since her application date.

2.  The claimant's discogeneric and degenerative joint disease of the lumbosacral spine is considered "severe" based on the requirements in the Regulations 20 CFR § 416.920(c).

3.  This medically-determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4.  The claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

5.  The claimant has the following residual functional capacity: to sit for at least six of eight hours in a work-day; to stand and/or walk for the same; to lift/carry 20 pounds occasionally and 10 pounds frequently; to occasionally kneel, crouch and crawl; and to be restrict to work that is simple, routine and requires low levels of concentration.

6.  The claimant is unable to perform any of her past relevant work (20 CFR § 416.965).

7.  The claimant is a "younger individual between the ages of 18 and 44" (20 CFR § 416.963).

9.      The claimant has more than a high school education (20 CFR § 416.967).[5]

10.     The claimant has no transferable skills (20 CFR § 416.968).

11.     The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 416.967).

12.     Although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational Rule 202.21 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform.  Examples of such jobs include: 1) small products assembler: 1588 jobs available locally and 1,200,000 nationally; 2) cashier: 54,794 locally and 3,500,000 nationally; 3) surveillance system: 968 locally and 55,000 nationally; 4) order clerk: 1209 locally and 293,000 nationally; and 5) jewelry assembler: 683 locally and 42,000 nationally.

13.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 416.920(g)).

R. 19.

II.     APPLICABLE LEGAL PRINCIPLES

A.      Scope of Judicial Review under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner must determine whether the Commissioner has applied the correct legal standard and whether the decision is supported by substantial evidence.  See, e.g., Acierno v. Barnhart, 475 F.3d 77, 81 (2d Cir.) (citing Pollard v. Halter, 377 F.3d 183, 188 (2d Cir. 2004)), cert. denied, 127 S. Ct. 2981 (2007); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); see generally 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").  "Substantial evidence" is "'more than a mere scintilla.  It means such relevant

---

[5]  No finding of fact identified as number "8" was made.

evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); accord Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

      B.    Standard Governing Evaluation of Disability Claims by the Agency

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." § 423(d)(2)(A).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).

Regulations issued pursuant to the Social Security Act set forth a five-step process that the Commissioner must use in evaluating a disability claim. See 20 C.F.R. § 404.1520(a)(4); see also Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000) (describing the five-step process). First, in evaluating the claim, the Commissioner must determine whether the claimant is currently

engaged in any "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(i). Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," § 404.1520(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities," § 416.920(c). Third, if the claimant's impairment is severe and is listed in 20 C.F.R. Part 404, Subpt. P, App. 1, or is equivalent to one of the listed impairments, the claimant must be found disabled. § 404.1520(a)(4)(iii). Fourth, if the claimant's impairment is not listed or is not equal to one of the listed impairments, the Commissioner must review the claimant's residual functional capacity to determine if the claimant is able to do work he or she has done in the past, i.e., "past relevant work." § 404.1520(a)(4)(iv). If the claimant is able to do such work, he or she is not disabled. Id. Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's residual functional capacity permits the claimant to do other work. § 404.1520(a)(4)(v). If the claimant cannot perform other work, he or she will be deemed disabled. Id. The claimant bears the burden of proof on all steps except the final one – that is, proving that there is other work the claimant can perform. Curry, 209 F.3d at 122 (citations omitted).

III.    DISCUSSION

Peña's brief argues that the case should be remanded because the ALJ erred in four ways: (1) by failing to fully develop the record as to her mental impairment; (2) by failing to comply with Social Security Ruling ("SSR") 00-4p; (3) by not finding Peña credible; and (3) by giving insufficient weight to Peña's treating physician's testimony. See Pl. Mem. at 6-12.

A.     <u>Development of the Record</u>

An ALJ has an affirmative duty to develop the record in a disability benefits case.  <u>See</u>, <u>e.g.</u>, <u>Rosa v. Callahan</u>, 168 F.3d 72, 79-80 (2d Cir. 1999); <u>Clark v. Comm'r of Soc. Sec.</u>, 143 F.3d 115, 118-19 (2d Cir. 1998).  The non-adversarial nature of a Social Security hearing requires the ALJ "to investigate the facts and develop the argument both for and against granting benefits." <u>Sims v. Apfel</u>, 530 U.S. 103, 111 (2000) (citing <u>Richardson v. Perales</u>, 402 U.S. 389, 400-01 (1971)); <u>accord</u> <u>Ceballos v. Bowen</u>, 649 F. Supp. 693, 698 (S.D.N.Y. 1986).  The ALJ's duty to develop the administrative record encompasses not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity.  <u>See</u>, <u>e.g.</u>, <u>Cruz v. Sullivan</u>, 912 F.2d 8, 11-12 (2d Cir. 1990); <u>Echevarria v. Sec'y of Health and Human Servs.</u>, 685 F.2d 751, 755-56 (2d Cir. 1982).

Peña argues that the ALJ failed to develop the record when he did not ask Peña why she was prescribed Lexapro medication.  Pl. Mem. at 6.  Peña argues that such a prescription suggests depression that could limit her ability to work.  <u>Id.</u>

The prescription for Lexapro, however, was for only a one-month period.  R. 146-47, 150.  Moreover, when Peña was asked at the hearing what "symptoms or complaints" she had that would interfere with her work, R. 181, she made no reference to any mental disorders.  Most significantly, there is not a single medical record that reflects any treatment for a mental disorders.

Peña cites <u>Gecevic v. Secretary of Health and Human Services</u>, 882 F. Supp. 278 (E.D.N.Y. 1995), for the proposition that the Commissioner has a duty to investigate signs of

depression, see Pl. Mem. at 6.   In Gecevic, however, the claimant had specifically claimed that

she had a mental impairment, Post-Traumatic Stress Disorder.   882 F. Supp. at 280.   In any

event, Gecevic did not address the issue of the duty to develop the record but instead remanded

because of the ALJ's failure to adequately explain his decision.   Certainly, an ALJ has the duty

to develop the record regarding a mental disability, see, e.g., Prentice v. Apfel, 11 F. Supp. 2d

420, 426 (S.D.N.Y. 1998), but nothing in the current record triggered such a duty.   There was

simply no evidence that Peña had been diagnosed or treated for any mental disorder that limited

her ability to work.

> B.     Compliance with SSR 00-4p

Peña argues that the ALJ violating SSR 00-4p, 2000 WL 1898704 (SSA Dec. 4, 2000),

by failing to ask the VE whether the VE's testimony was consistent with the Dictionary of

Occupational Titles ("DOT") and to obtain explanations for any inconsistencies.   See Pl. Mem.

at 8.

> SSR 00-4p provides:
>
> When a VE . . . provides evidence about the requirements of a job or occupation,
> the adjudicator has an affirmative responsibility to ask about any possible conflict
> between that VE . . . evidence and information provided in the DOT. In these
> situations, the adjudicator will:
>
> Ask the VE . . . if the evidence he or she has provided conflicts with information
> provided in the DOT; and if the VE's . . . evidence appears to conflict with the
> DOT, the adjudicator will obtain a reasonable explanation for the apparent
> conflict.

SSR 00-4p, 2000 WL 1898704, at *4; accord Massachi v. Astrue, 486 F.3d 1149, 1152-53 (9th

Cir. 2007); see also Leonard v. Comm'r of Soc. Sec., 2008 WL 3285947, at *9 (N.D.N.Y. Aug.

7, 2008) (SSR 00-4p "requires, as part of the adjudicator's duty to develop the record fully, that

the adjudicator inquire, on the record, about whether or not there is a consistency between the evidence that the VE provides and the DOT"). Here, the vocational expert ALJ posed no questions to the vocational expert regarding the DOT. Indeed, nowhere in the testimony transcript or the ALJ decision is the DOT mentioned. See R. 14-20, 190-92.

In response to this argument, the Commissioner does not dispute that the vocational expert "provide[d] evidence about the requirements of a job or occupation" – the predicate triggering a further duty under the regulations. Nor does the Commissioner argue that the ALJ's failure "to ask about any possible conflict between" that evidence and information provided in the DOT – the explicit mandate of the regulation – resulted in a harmless error. See, e.g., Renfrow v. Astrue, 496 F.3d 918, 921 (8th Cir. 2007) (failure to comply with SSR 00-4p was harmless where no conflict existed). Instead the Commissioner argues only that the expert was not required to cite to "specific codes" in the DOT and that the expert was entitled to rely on the expert's testimony regarding occupations. Def. Reply at 6-7 (citing 20 C.F.R. § 416.967(e)[6]). This argument, however, begs the question of whether there was any conflict with information in the DOT. Because there was plainly a violation of the regulation and the Commissioner makes no argument that the violation was harmless or could otherwise be excused, remand is appropriate. Acierno, 475 F.3d at 81. On remand, the ALJ should ensure compliance with SSR 00-4p.[7]

─────────────────

   [6]  The Commissioner likely intended to cite to 20 C.F.R. § 416.966(e), which provides general authority for VE's to be used.

   [7]  Following remand and depending on the results of this inquiry, it may be appropriate for the ALJ to clarify whether Peña's "basic command of English," R. 190, is sufficient to meet the DOT's standards on language ability for the surveillance system monitor, order clerk and cashier job titles. See DOT 379.367-010 (1991 WL 673244); DOT 249.362-026 (1991 WL

Peña also complains that the VE did not explain how she calculated the number of jobs in the economy for the various titles. Pl. Mem. at 8. This is not a ground for remand, however, because a "VE's recognized expertise provides the necessary foundation for his or her testimony." Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005).

C.      Peña's Credibility

Peña next argues that the ALJ erred in finding she was not credible. Pl. Mem. at 10-12 (citing SSR 96-7p, 1996 WL 374186; Akers v. Callahan, 997 F. Supp. 648, 653 (W.D. Pa. 1998)). The Second Circuit has held that where an ALJ rejects witness testimony as not credible, the basis for the finding "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988) (citing Carroll v. Sec'y of Health and Human Servs., 705 F.2d 638, 643 (2d Cir. 1983)); accord Snell v. Apfel, 177 F.3d 128, 135 (2d Cir. 1999). The ALJ must make this determination "in light of the objective medical evidence and other evidence regarding the true extent of the alleged symptoms." Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984). The Social Security Administration ("SSA") has issued a regulation relating to reports of pain or other symptoms by a claimant for SSI benefits. 20 C.F.R. § 416.929(c)(1). This regulation provides, inter alia, that the SSA "will not reject [a claimant's] statements about the intensity and persistence of [her] pain or other symptoms or about the effect [her] symptoms have on [her] ability to work . . . solely because the available objective medical evidence does not substantiate [her] statements." Id. The regulations also provide that the SSA "will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [her]

_____

672320); DOT 211.462-010 (1991 WL 671840).

statements and the rest of the evidence."  20 C.F.R. § 416.929(c)(4).

The Social Security ruling cited by plaintiff, SSR 96-7p, largely repeats the requirements

contained in the regulations.  The ruling states:

> In recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 CFR 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements:
>
> 1. The individual's daily activities;
>
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
>
> 3. Factors that precipitate and aggravate the symptoms;
>
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
>
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
>
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (SSA July 2, 1996); Wright v. Astrue, 2008 WL 620733, at

*3 (E.D.N.Y. Mar. 5, 2008) (discussing whether ALJ adequately considered the guideline's

factors).  Additionally, the ALJ should examine the claimant's internal consistency and may

consider personal observations as long as they are part of a larger overall evaluation.  SSR 96-7p,

1996 WL 374186, at *5, 8.

Here, Peña testified specifically regarding her pain, R. 181-84, 188, and gave some

testimony regarding her ability to lift, R. 185.  As noted, the medical record are replete with reports of her complaints of pain.  Nonetheless, the ALJ found that Peña's allegations regarding "her limitations" were not "totally credible."  R. 19.  The "limitations" he is referring to, however, are not specified.  In addition, while the ALJ referred generally to her testimony, R. 16, and to the reports of pain in the medical records, R. 17, and appears to accept that Peña experiences pain, R. 18 ("because of her pain," Peña has certain restrictions on work); id. (referring to Peña's ability to work "despite her condition"), the decision does not sufficiently reflect that the ALJ examined the factors listed in 20 C.F.R. § 416.929(c)(4) and SSR 96-7p, particularly in light of the fact that there has been some consistency in Peña's complaints of pain to her treating doctors.  See Cloutier v. Apfel, 70 F. Supp. 2d 271, 278 (W.D.N.Y. 1999) ("consistency of individual's own statements is one strong indication of credibility, especially those complaints that are made to treating or examining medical sources") (citing SSR 96-7p, 1996 WL 374186 at *4-5).  Further, while the decision correctly notes that Peña's pain went away following physical therapy, see R. 142, 157, it does not address the record evidence that Peña told a treating physician that her pain returned just days after a successful physical therapy session when Peña attempted to lift a heavy object, R. 143.

The ALJ's decision needs to explain what portions of Peña's testimony are being rejected and for what reason.  The ALJ should also explain with greater specificity, and with specific reference to the factors listed in SSR 96-7p wherever possible, why the record supports his views as to Peña's true limitations.  The Court notes that Dr, Cohen testified only conclusorily with respect to the significance of the medical records in evaluating Peña's reports of her limitations.

In sum, the governing regulations and SSR 96-7p require further explanation of the

ALJ's credibility finding.  On remand, the ALJ is free to develop the record to obtain additional relevant evidence on this point.

       D.     <u>Treating Physician Rule</u>

      Peña argues that the ALJ erred by failing to follow the treating physician rule. Pl. Mem. at 8.  In determining whether a claimant is disabled, a treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence."  20 C.F.R. § 404.1527(d)(2).  Under this rule, the Commissioner is not required to give deference to the treating physician's opinion where the treating physician "issued opinions that are not consistent with other substantial evidence in the record, such as the opinions of other medical experts."  <u>Halloran v. Barnhart</u>, 362 F.3d 28, 32 (2d Cir. 2004).  Moreover, "the less consistent that [a treating physician's] opinion is with the record as a whole, the less weight it will be given."  <u>Snell v. Apfel</u>, 177 F.3d 128, 133 (2d Cir. 1999).  "Genuine conflicts in the medical evidence are for the Commissioner to resolve."  <u>Veino v. Barnhart</u>, 312 F.3d 578, 588 (2d Cir. 2002).

      In light of the fact that the case must be remanded for the ALJ to reevaluate the credibility of Peña's testimony regarding her limitations, the Court will not reach the question of whether the ALJ properly applied the treating physician rule inasmuch the "record as a whole" may change following remand.  The Court notes that it will be of assistance to any reviewing body if the ALJ explicitly applies the factors outlined in 20 C.F.R. § 404.1527(d)(2).

       E.     <u>Attorney's Fees</u>

      Peña's application for attorney fees is denied because the Commissioner was

substantially justified in his position.  See Equal Access to Justice Act, 28 U.S.C. § 2412(d).

"The test for determining whether a position is 'substantially justified' is one of reasonableness,

and the Government has the burden of demonstrating reasonableness by a 'strong showing.'"

Cohen v. Bowen, 837 F.2d 582, 585 (2d Cir. 1988) (citing Envtl. Def. Fund, Inc. v. Watt, 722

F.2d 1081, 1085 (2d Cir. 1983)).  The Commissioner's arguments were sufficiently weighty that

he has met the standard for a "strong showing" of reasonableness.  Thus, Peña's request for

attorney fees is denied.

IV.    CONCLUSION

The motion for judgment on the pleadings (Docket # 10) is granted in part and denied in

part.  The case is remanded to the Social Security Administration for further proceedings

consistent with this decision.  The Clerk is requested to enter a judgment.

SO ORDERED.

Dated:  December 3, 2008
        New York, New York


_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge


Copies sent to:

Rannylin S. Dalley, Esq.
Piard Dalley, PLLC
1916 Park Avenue Suite 614
New York, NY 10037

John E. Gura Jr.
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, NY 10007

substantially justified in his position.  See Equal Access to Justice Act, 28 U.S.C. § 2412(d).

"The test for determining whether a position is 'substantially justified' is one of reasonableness,

and the Government has the burden of demonstrating reasonableness by a 'strong showing.'"

Cohen v. Bowen, 837 F.2d 582, 585 (2d Cir. 1988) (citing Envtl. Def. Fund, Inc. v. Watt, 722

F.2d 1081, 1085 (2d Cir. 1983)).  The Commissioner's arguments were sufficiently weighty that

he has met the standard for a "strong showing" of reasonableness.  Thus, Peña's request for

attorney fees is denied.

IV.   CONCLUSION

        The motion for judgment on the pleadings (Docket # 10) is granted in part and denied in

part.  The case is remanded to the Social Security Administration for further proceedings

consistent with this decision.  The Clerk is requested to enter a judgment.

SO ORDERED.

Dated:  December 3, 2008
        New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies sent to:

Rannylin S. Dalley, Esq.
Piard Dalley, PLLC
1916 Park Avenue Suite 614
New York, NY 10037

John E. Gura Jr.
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, NY 10007

23